**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**WILLIE WALKER,**

                              **Plaintiff,**

        **vs.**                                                    **6:12-cv-01587**
                                                                   **(MAD/TWD)**

**CITY OF UTICA; DANIEL LABELLA,
individually and in his official capacity as
Utica Police Chief; MARK WILLIAMS,
individually and in his official capacity as Utica
Police Chief; JOHN TOOMEY, individually and in
his official capacity as Utica Policy Captain; LOUIS
CAPRI, individually and in his official capacity as
Utica Police Lieutenant; EDWARD NOONAN,
individually and in his official capacity as Utica
Police Office; STANLEY FERNALD, individually
and in his official capacity as Utica Police Offer;
FRANK MUCITELLI, individually and in his
official capacity as Utica Police Officer; JOSHUA
GRANDE, individually and in his official capacity
as Utica Police Officer; JAMES HOLT, individually
and in his official capacity as Utica Police Officer;
TOFF DUVAL, individually and in his official
capacity as Utica Police Officer; MICHAEL
CURLEY, individually and in his official capacity
as Utica Police Officer; SAMUEL GEDDES,
individually and in his official capacity as Utica
Police Officer; STEVEN HAUCK, individually and
in his official capacity as Utica Police Officer;
BRIAN BANSNER, individually and in his official
capacity as Utica Police Officer; HOWARD
BRODT, individually and in his official capacity as
Utica Police Officer; and LINDA FATATA,
individually and in her official capacity as
Corporation Counsel,**

                              **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**WILLIE WALKER**
908 Downer Avenue
Utica, New York 13502
Plaintiff *pro se*

**CITY OF UTICA OFFICE OF**     **JOHN P. ORILIO, ESQ.**
**CORPORATION COUNSEL**     **ZACHARY C. OREN, ESQ.**
One Kennedy Plaza
Utica, New York 13502
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**[1]

Plaintiff *pro se* commenced this action on October 23, 2012, pursuant to 42 U.S.C. § 1983

alleging that Defendants violated various constitutional rights. *See* Dkt. No. 1. Specifically,

Plaintiff claims that he was subjected to, among other things, false arrest, malicious prosecution,

unlawful search and seizure, conspiracy to violate his civil rights, First Amendment retaliation,

cruel and unusual punishment in violation of the Eighth Amendment, and that various Defendants

failed to intervene when his constitutional rights were being violated. *See generally id.*

Presently before the Court is Defendants' motion for summary judgment. *See* Dkt. No. 52.

**II. BACKGROUND**[2]

---

[1] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

[2] In the background section of this Memorandum-Decision and Order, the Court has partially relied on Plaintiff's complaint to set forth the relevant facts, insofar as such facts are also supported by evidence in the record. The Court is mindful of Plaintiff's failure to comply with Local Rule 7.1(a)(3), which requires a nonmoving party to file a "mirror" response to the moving party's statement of material facts that specifically "admit[s] and/or den[ies] each of the movant's assertions in matching numbered paragraphs." N.D.N.Y. L.R. 7.1(a)(3). However, the statement
(continued...)

At all relevant times to this action, Plaintiff was a resident of Utica, New York. *See* Dkt. No. 1 at ¶ 1. The named Defendants in this action are all employed by the City of Utica. Defendant Fatata is the City of Utica's Corporation Counsel. *See id.* at ¶ 19. Defendants LaBella and Williams are the former and current Chiefs of Police, respectively. *See id.* at ¶¶ 3-4. The remaining named Defendants are all Utica Police Officers. *See id.* at ¶¶ 5-15.

On August 31, 2008, Plaintiff signed a lease for the property located at 315 Nichols Street, Utica, New York. *See id.* at ¶ 18. Plaintiff has habitually referred to 315 Nichols Street as "Pete's." *See* Dkt. No. 52-31 at ¶ 82. Although Pete's caught fire and burned down in the month of January 2010, the premises "were active until the aforementioned fire." *See id.* at ¶ 5. Defendants contend that Plaintiff "was running the establishment" at 315 Nichols Street, Utica, New York and "at times had control of the premises." *See* Dkt. No. 52-31 at ¶¶ 14, 88.

According to the complaint, Plaintiff contends that "Defendant Fatata began retaliation against plaintiff's business, along with Stephen Patterson by placing his building 315 Nichols St. on the police 'Hot Spot' list on September 7, 2008. Plaintiff was [h]arassed and illegally video taped by the Utica Police for a year." *See* Dkt. No. 1 at ¶ 21; *see also* Dkt. No. 52-31 at ¶ 1.

On November 9, 2008, Plaintiff contends that he received a phone call from Mr. Patterson to open Pete's for a party allegedly being hosted by Utica College. *See* Dkt. No. 52-3 at 109. During the course of the evening, Defendants Fernald and Muticelli, in their official capacity, arrived at the 315 Nichols Street property. *See id.* at 112-13. Defendants questioned Plaintiff as to "what was going on" at Pete's and Plaintiff testified that "it was a Utica College party" and that he was "looking over" Pete's to "make sure everything was safe." *See id.* at 113. Following

---

[2](...continued)
of material facts submitted by Defendants in this case provides the Court with a relatively fragmented and unclear recitation of the relevant background facts.

further conversation, Plaintiff contends that Defendant Muticelli threatened to "kick [Plaintiff's] black ass," although no physical contact ever occurred. *See* Dkt. No. 52-31 at ¶ 6. Thereafter, Plaintiff was charged with, and found guilty after trial of, operating a cabaret without a license. *See id.* at ¶ 7. Plaintiff was sentenced to pay a $200.00 fine. *Id.*

On October 24, 2009, Plaintiff contends that Defendants Noonan, Holt, Geddes, Grande, and Duval of the Special Operations Unit under the command of Defendant Capri, "showed up at an event at 315 Nichols St. hosted by a young lady who rented the venue for that night." *See* Dkt. No. 1 at ¶ 34. Plaintiff had been earlier contacted by T.S., the renter, to reserve Pete's for the evening at a negotiated price of $200.00. *See* Dkt. No. 52-3 at 40-41. Plaintiff later opened Pete's for T.S. and received the $200.00 payment. *Id.* Plaintiff contends that, according to the police narrative, Defendants "went to 315 Nichols St. for a premise[s] check. There [were] no 911 calls, crimes [in] progress, or no police assistance required at the location." *See* Dkt. No. 1 at ¶ 33. Plaintiff further contends that Defendant Noonan "fabricated a story that he had seen a teen fall thirty feet down a flight of stairs" and "used this deceit in order to have probable cause to enter and search the second floor of the premises where the party took place." *See id.* at ¶¶ 35-36.

Plaintiff's trial on the charges stemming from the October 24, 2009 incident occurred on June 15, 2010 in Utica City Court in front of Judge Gerald J. Popeo. *See* Dkt. No. 52-8 at 3. At trial, Defendant Duval testified that he was patrolling the East Utica area shortly after midnight when he received a call for units to respond to Pete's to assist him. *See id.* at 9-10. When Defendant Duval arrived, he observed Defendants Noonan and Holt in front of the premises speaking with Mr. Patterson. *See id* at 10. Defendant Duval testified that he could hear loud music upon arriving and issued Mr. Patterson a general noise violation. *See id.* at 10-11. As he was approaching, Defendant Noonan further testified that he observed Plaintiff exit and enter the

establishment several times. *See id.* at 11. Shortly thereafter, the neon sign outside the establishment was turned off and Defendant Duval observed "a large crowd of juveniles . . . beginning [to] exit[] the establishment." *See id.* Defendant Duval testified that there were approximately 100 individuals exiting the premises and that they were anywhere between the ages of fifteen to seventeen. *See id.* at 11-12. Defendant Duval further testified that he observed Defendant Grande exit the premises with J.B., who was sixteen years of age and intoxicated. *See id.* at 13. While inside Pete's, Defendant Duval testified that he observed a bar area, empty liquor bottles scattered throughout the establishment, including some on the floor, and evidence that marijuana had been used. *See id.* at 19-20.

Defendant Holt testified that he and Defendant Noonan went to Pete's on October 24, 2009 because the illegal activity that generally occurred there happened on Friday and Saturday nights – "when they would have the gatherings there, the parties. The illegal cabaret activity." *See* Dkt. No. 52-14 at 5-6. When Defendant Holt first arrived at Pete's, he testified that he and Defendant Noonan observed "numerous – they appeared to be juveniles – younger teenage males and females going in and out of the Nichols Street side door of the establishment, which is the common door that people normally use to enter and exit the establishment." *Id.* at 8. Defendant Holt estimated that the juveniles were anywhere between thirteen and seventeen years of age. *See id.* at 9. Defendant Holt heard loud music coming from the establishment and interviewed several of the teenagers who were loitering outside. *See id.* at 10. These teenagers advised Defendant Holt that there was "a party going on inside and there was an entry fee of $5." *Id.* Further, Defendant Holt testified that Plaintiff advised him that they were having a birthday party in the club. *See id.* at 11.

Defendant Holt performed a breathalyser test on J.B., a juvenile who was at Pete's on the

evening of October 24, 2009. *See* Dkt. No. 52-31 at ¶ 31. The test indicated that J.B. had a blood

alcohol content of at least 0.08%. *See id.* J.B.'s mother later confirmed that J.B. was not

intoxicated before he left for the party. *See id.* at ¶ 32.

Defendants' testimony was supported by the deposition of Maurice D. Titus – the DJ hired

to perform at the birthday party. *See* Dkt. No. 52-11 at 2-4. Mr. Titus was hired by T.S., who

was celebrating her birthday at Pete's. *See id.* Mr. Titus further stated that the individuals at the

party ranged from approximately fourteen to twenty-one years of age, "but the majority were

definitely under twenty-one (21)." *Id.* at 3. Mr. Titus observed many under-aged attendants

drinking alcoholic beverages, often straight from the bottle. *See id.* Mr. Titus also recalled a

specific incident from that evening:

> At one point some drunk girl came to my DJ table and told me that
> a girl was passed out on the floor near the wall. The girl came to me
> and pointed to the girl and said 'She dead, she dead,' referring to the
> passed out girl. Soon after that I saw two other girls helping the
> passed out girl to her feet. The girl was hardly able to walk, and was
> moving around like jelly, meaning that she was limp and was unable
> to stand on her own. I turned on the light when they were picking her
> up to see what happened, and when I saw them moving her I turned
> off the light and went back to playing music.

*Id.*; *see also* Dkt. No. 52-12 (supporting deposition of T.S. corroborating Defendants' testimony at

trial). Mr. Titus also stated that he had been hired by Plaintiff to DJ a different teen party at Pete's

for $150 the week prior on October 17, 2009. *See* Dkt. No. 52-11 at 2.

Although Plaintiff was acquitted after trial of most of the charges stemming from the

October 24, 2009 incident, the court found him guilty of operating a cabaret without a license and

sentenced him to fifteen days in jail. *See* Dkt. No. 52-6 at 2. Plaintiff contends that Defendants

lacked probable cause to enter and search the second floor of the premises. *See* Dkt. No. 1 at ¶

36. Plaintiff also contends that "[D]efendants took crime scene photos of the same bottles in

different positions and locations to appear as evidence of a teen drinking party given by the [P]laintiff." *See id.* at ¶ 51. Further, Plaintiff alleges that the Utica Dispatch, WKTV, YNN, and Utica Daily News received a press release by Defendant Labella accusing Plaintiff of serving alcohol to minors at the October 24, 2014 event. *See id.* at ¶ 53.

On January 1, 2010, Utica City Court Judge John Balzano issued a search warrant for the interior and exterior of Pete's, to be executed between 12:00 a.m. and 6:00 a.m. that same day. *See* Dkt. No. 52-18. The warrant indicated that it was to seek "[e]vidence of the operation of a 'cabaret' and/or of the illegal sale or consumption of alcohol; evidence of the names and addresses of persons on or about the premises." *See id.* at 2. Investigator Laurey submitted the search warrant application. *See id.* at 3. The application detailed the various incidents that Defendants had responded to in October of 2009, as well as road checks that they had conducted involving individuals who had been at 315 Nichols Street. *See id.* at 4. Additionally, the application noted that "[o]n December 16, 2009 the Honorable Samuel D. Hester Supreme Court Justice ruled that the owner of the 315 Nichols St., Utica, NY, Stephen Patterson, [is] prohibited from using the property for uses not permitted under the zoning of the property without having gotten either a special permit or variance from the zoning board of appeals and that would include operation as a bar or restaurant or similar commercial use." *Id.* After receiving the injunction, Mr. Patterson drafted a letter to Defendant Williams requesting that he be permitted to operate the premises at 315 Nichols Street on New Years Eve of 2009. *See id.* Further, the warrant application indicates that, "[o]n December 31, 2009 a concerned citizen presented a flyer stating that Petes will be holding a New Years Eve party . . . . The flyer further states that free food and free drinks will be provided." *Id.* Specifically, the flyer states "FREE SOUL FOOD, JAMAICAN FOOD . . . GIVE ME $20 B4 12AM. PETE'S LAST PARTY. PETE'S LAST PARTY. 10PM UNTIL YOU

QUIT." Dkt. No. 52-17 at 2. Plaintiff testified that he helped prepare chicken and his "specialty rice" for the event. *See* Dkt. No. 52-3 at 66-68, 70.

In the early morning hours of January 1, 2010, Defendants executed the search warrant for 315 Nichols Street, Utica, New York. *See* Dkt. No. 52-23. When they arrived, Mr. Patterson and Plaintiff were at the front door and Mr. Patterson was served with the warrant. *See* Dkt. No. 52-3 at 77, 80. The first floor bar was empty, but Defendants could hear loud music coming from the second floor. *See* Dkt. No. 51-23 at 17. When Defendants proceeded to the second floor, they observed people dancing and at the bar. There was a DJ playing music and alcohol being consumed. *See id.* Defendants included a video of their execution of the warrant, which corroborates the account of what was found. *See* Dkt. No. 51.

On May 12, 2010, a Report and Recommendation was issued by the Nuisance Abatement Hearing Panel following an administrative hearing. *See* Dkt. No. 52-27 at 4-11. The Report and Recommendation recommended that Plaintiff and Mr. Patterson "be prohibited and banned from operating any night club, cabaret, café, restaurant, banquet hall, after-hours night club, dance hall, concert hall, meeting room, or any other place of public assembly or public accommodation at the premises located at 313-315 Nichols Street in Utica, New York." *Id.* at 10-11. On May 14, 2010, Defendant LaBella, as the Commissioner of Public Safety, adopted the Report and Recommendation and determined that the prohibition shall be for one year. *See id.* at 2-3. Further, Defendant LaBella revoked any Certificate of Occupancy issued by the City of Utica. *See id.*

Presently before the Court is Defendants' motion for summary judgment.


## III. DISCUSSION

## A.    Applicable Law

### 1. Summary Judgment Standard

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Sec. Ins. Co. v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82 (2d Cir. 2009) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Sutera v. Schering Corp.*, 73 F.3d 13, 15-16 (2d Cir. 1995) (quotation and other citation omitted). Additionally, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertion in its pleading. *See Celotex Corp. v. Catrett*, 447 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In evaluating the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the nonmoving party either does not respond to the motion or fails to dispute the moving party's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement. Rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than

that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)) (other citation omitted).  The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education.  *Id.* at 295 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983))).  "This does not mean, however, that a *pro se* litigant is excused from following the procedural requirements of summary judgment."  *Walker v. Artus*, 998 F. Supp. 2d 18, 25 (N.D.N.Y. 2014) (citing *Govan*, 289 F. Supp. 2d at 295).  Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence is not sufficient to overcome a motion for summary judgment."  *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Cary v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

### 2.  *False Arrest*

"A § 1983 claim for false arrest, . . . including arrest without probable cause, . . . is substantially the same as a claim for false arrest under New York law."  *Zaniewska v. City of New York*, 569 Fed. Appx. 39, 40 (2d Cir. 2014) (citing *West v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)) (internal quotation marks and brackets omitted).  Accordingly, under both New York law and the Fourth Amendment to the United States Constitution, the elements of a false arrest action are as follows: "'(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'"  *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) (quotation omitted).

"'Justification may be established by showing that the arrest was based on probable

cause.'" *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (quotation omitted).

Probable cause exists "when the attesting officer 'has knowledge or reasonably trustworthy

information of facts and circumstances that are sufficient to warrant a person of reasonable

caution in the belief that the person to be arrested has committed a crime or is committing a

crime.'" *Torraco v. Port Auth.*, 615 F.3d 129, 139 (2d Cir. 2010) (quotation omitted). "The

existence of probable cause must be determined on the basis of the totality of the circumstances, .

. . and 'where the law enforcement authorities are cooperating in an investigation . . . , the

knowledge of one is presumed shared by all.'" *Calamia v. City of New York*, 879 F.2d 1025, 1032

(2d Cir. 1989) (internal citation and quotation omitted). "An officer retains probable cause to

arrest a plaintiff 'even if the probable cause was for a crime different from what the police officers

believed to have been committed.'" *Davis v. City of New York*, 373 F. Supp. 2d 322, 330

(S.D.N.Y. 2005) (quotation and other citations omitted).[3]


### 3. *Malicious Prosecution*

"The Fourth Amendment right implicated in a malicious prosecution action is the right to

be free of unreasonable seizure of the person – i.e., the right to be free of unreasonable or

unwanted restraints on personal liberty." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 116 (2d Cir.

1995). To assert a Fourth Amendment claim for malicious prosecution under section 1983, a

plaintiff must show a deprivation of his or her liberty consistent with the concept of "seizure," so

as to ensure that the harm suffered is of "constitutional proportions." *Id.*

---

[3] Although probable cause is a defense to both false arrest and malicious prosecution claims, the probable cause analysis for each claim demands a slightly different analysis. Accordingly, the Court will analyze Plaintiff's false arrest and malicious prosecution claims independently. *See Talukder v. City of Troy*, No. 1:12-CV-1765, 2014 WL 3670770, *6 (N.D.N.Y. July 23, 2014) (citations omitted).

The elements of malicious prosecution under section 1983 effectively mirror the elements of the same claim under New York law. *See Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992) (citations omitted). Accordingly, to state a cause of action for malicious prosecution in New York, the plaintiff must prove "(1) commencement of a criminal proceeding, (2) favorable termination of the proceeding, (3) lack of probable cause, and (4) institution of the proceedings with actual malice." *Swartz v. Insogna*, 704 F.3d 105, 111-12 (2d Cir. 2013) (citations omitted). To sustain the malicious prosecution claim under section 1983, "the state law elements must be met, and there must also be a showing of a 'sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.'" *Rutligiano v. City of New York*, 326 Fed. Appx. 5, 8-9 (2d. Cir. 2009) (quotation omitted). "Unlike an arrest, which only requires probable cause that 'the suspect had committed . . . an offense[,]' a prosecution requires probable cause 'to charge [the suspect] with each of the crimes.'" *Talukder*, 2014 WL 3670770, at *6 (citations omitted). Therefore, when considering Plaintiff's malicious prosecution claim, the Court must separately consider each count with which Plaintiff was charged. *See id.*

### a. Probable Cause

In the context of a malicious prosecution claim, probable cause under New York law turns on "the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." *Bernshtein v. City of New York*, 496 Fed. Appx. 140, 142 (2d Cir. 2012) (quotation omitted); *see also Colon v. New York*, 60 N.Y.2d 78, 82 (1983) (holding that probable cause to prosecute consists of "such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty"). "[T]he existence of probable cause is a complete

defense to a claim of malicious prosecution in New York." *Savino*, 331 F.3d at 72; *see also Stansbury v. Wetman*, 721 F.3d 84, 94-95 (2d Cir. 2013).

"In order to survive a motion for summary judgment on the malicious prosecution claim, [the plaintiff] must have evidence sufficient for a reasonable jury to find that his indictment was procured as a result of police conduct undertaken in bad faith." *Savino*, 311 F.3d at 73. The presumption of probable cause in not rebutted "with mere 'conjecture' and 'surmise.'" *Id.* (citing *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)); *see also Sclafani v. Spitzer*, 734 F. Supp. 2d 288, 299 (E.D.N.Y. 2010) (holding that "mere conjecture and surmise that an indictment was procured as a result of conduct undertaken in bad faith cannot overcome the presumption of probable cause created in an indictment" (quotations and citation omitted)); *Fernandez v. DeLeno*, 71 F. Supp. 2d 224, 229 (S.D.N.Y. 1999) ("To survive a motion for summary judgment [on a malicious prosecution claim], the plaintiff must present admissible facts and may not rely on bare allegations of facts, ultimate or conclusory facts, or legal conclusions").

"[E]ven when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause." *Kent v. Thomas*, 464 Fed. Appx. 23, 25 (2d Cir. 2012) (quotation omitted). However, "[i]n order for probable cause to dissipate, the groundless nature of the charge must be made apparent [to the defendants] by the discovery of some intervening fact." *Kinzer v. Jackson*, 316 F.3d 139, 144 (2d Cir. 2003) (quotations and citation omitted); *see also Husbands ex rel. Forde v. City of New York*, 335 Fed. Appx. 124, 128 (2d Cir. 2009) (citation omitted). "[T]he question is whether either the evidence gathered after arrest undermined a finding of probable cause, or whether the . . . Defendants' inquiry into the alleged [crime] so far departed from what a reasonable person would have undertaken as to itself constitute evidence of lack of probable cause." *Rae v. Cnty. of Suffolk*, 693 F. Supp. 2d 217, 227

(E.D.N.Y. 2010). "[D]efendants are not obligated to exonerate [the] plaintiff or uncover exculpatory evidence, but the 'failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.'" *Lawrence v. City Cadillac*, No. 10 Civ. 3324, 2010 WL 5174209, *6 (S.D.N.Y. Dec. 9, 2010) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996)).

### b. Actual Malice

Actual malice "'does not require a plaintiff to prove that the defendant was motivated by spite or hatred[,]'" but instead that he initiated or continued the criminal proceeding "'due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" *Rounseville v. Zahl*, 13 F.3d 625, 630 (2d Cir. 1994) (quotation omitted). "Actual malice generally is shown by circumstantial evidence, including a lack of probable cause." *Talukder*, 2014 WL 3670770, at *7 (citing *Martin v. City of Albany*, 42 N.Y.2d 13, 17 (1977)). Both the Second Circuit and New York courts have held that, although

> "lack of probable cause to institute a criminal proceeding and proof of actual malice are independent and indispensable elements of a malicious prosecution action, the absence of probable cause does bear on the malice issue." . . . A jury may infer the [existence] of actual malice from the absence of probable cause.

*Maxwell v. City of New York*, 156 A.D.2d 28, 34 (1st Dep't 1990) (quotation and other citation omitted); *see also Lowth*, 82 F.3d at 573 (holding that, "[i]n most cases, the lack of probable cause – while not dispositive – tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause" (internal quotation omitted)).

### 4. First Amendment Retaliation

The Second Circuit has "'described the elements of a First Amendment retaliation claim in several ways, depending on the factual context.'" *Zherka v. Amicone*, 634 F.3d 642, 644 (2d Cir. 2011) (quotation omitted). "Where a private citizen asserts a First Amendment claim against a public official, the plaintiff must demonstrate that (1) the plaintiff engaged in speech or conduct that the First Amendment protects; (2) the plaintiff's exercise of his First Amendment rights motivated the defendant's actions; and (3) the defendant's actions effectively chilled the plaintiff's exercise of those rights." *Hafez v. City of Schenectady*, 894 F. Supp. 2d 207, 221 (N.D.N.Y. 2012) (citing *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008)).

"In cases involving criticism of public officials by private citizens, the Second Circuit has traditionally imposed an actual chill requirement for First Amendment retaliation claims, *i.e.*, a requirement that plaintiff allege and ultimately prove an actual chill of his First Amendment rights." *Id.* (citing *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004)) (internal quotation marks and brackets omitted). To satisfy this element, "it is not enough for the plaintiff simply to show that he changed his behavior in some way; he must show that the defendant intended to, and did, prevent or deter him from exercising his rights under the First Amendment." *Id.* (citations omitted).

### 5. *Unlawful Search*

The Fourth Amendment protects individuals in their homes "against unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless search is 'per se unreasonable . . . subject to only a few specifically established and well-delineated exceptions.'" *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)).

It is well-settled that the Fourth Amendment only proscribes unreasonable searches and seizures. *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989) (citations omitted). The permissibility of a search "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" *Id.* (quotation and other citation omitted).

In *Ruggiero v. Krzeminski*, the Second Circuit held that although a search conducted without a warrant is

> presumptively unreasonable . . . [t]he operation of this presumption . . . cannot serve to place on the defendant the burden of proving that the official action was reasonable. Rather, the presumption may cast upon the defendant the duty of producing evidence of consent or search incident to an arrest or other exceptions to the warrant requirement. However, the ultimate risk of nonpersuasion must remain squarely on the plaintiff in accordance with established principles governing civil trials.

*Ruggiero v. Krzeminski*, 928 F.2d 558, 563 (2d Cir. 1991) (internal and other citations omitted).

### 6. *Qualified Immunity*

"The doctrine of qualified immunity shields public officials from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).

> For a constitutional right to be "clearly established" for purposes of determining whether an officer is entitled to qualified immunity, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that *in the light of pre-existing law the*

16

*unlawfulness must be apparent*."

*Mollica v. Volker*, 229 F.3d 366, 370-71 (2d Cir. 2000) (quoting *Anderson v. Creiehton*, 483 U.S. 635, 640 (1987)) (emphasis in original).  "Where the right at issue in the circumstances confronting police officers . . . was clearly established but was violated, the officers will nonetheless be entitled to qualified immunity 'if . . . it was objectively reasonable for them to believe their acts did not violate those rights.'"  *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quotation and other citation omitted).

        "Although a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, the doctrine does not shield performance that either (a) was in violation of clearly established law, or (b) was plainly incompetent."  *Manganiello v. City of New York*, 612, F.3d 149, 165 (2d Cir. 2010) (citations omitted).  "With respect to both the legal question and the matter of competence, the officials' actions must be evaluated for objective reasonableness. . . .  That is, '[e]ven if the right at issue was clearly established in certain respects . . . an officer is still entitled to qualified immunity if "officers of reasonable competence could disagree" on the legality of the action at issue in its particular factual context.'"  *Id.* (quotations omitted).

        The determination of whether an official's conduct was objectively reasonable is a mixed question of law and fact.  *See Zellner*, 494 F.3d at 367 (citing *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)) (other citations omitted).  "The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, *i.e.*, whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court.  However, '[a] contention that . . . it was objectively reasonable for the official to believe that his acts did not violate those rights has "its

principle focus on the particular facts of the case."'" *Id.* (quotation and other citations omitted).

If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court. *See id.* at 368 (citation omitted). Any unresolved factual issues, however, must be resolved by the jury. *See id.* (quoting *Kerman*, 374 F.3d at 109) (other citations omitted). Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make the ultimate legal determination of whether qualified immunity attaches on those facts." *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (quotation omitted); *see also Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (quotation omitted).

## B.      Application

### 1.  Defendants Bansner, Capri, and Brodt

Defendants contend that all claims against Defendants Bansner, Capri, and Brodt must be dismissed because "no where in the admissible record do their names appear as having been involved with this case." *See* Dkt. No. 52-32 at 7. Plaintiff does not refute this argument. *See* Dkt. No. 55 at 2.

The Court agrees with Defendants that none of Plaintiff's claims allege any wrongdoing by Defendants Bansner, Capri, and Brodt. Accordingly, the Court grants this portion of Defendants' motion for summary judgment.

### 2.  Defendant Fatata

Defendants contend that all claims against Defendant Fatata must be dismissed because "Plaintiff has failed to plead/and or prove a First Amendment Retaliation Claim." *See* Dkt. No.

52-32 at 7.  Plaintiff does not refute this argument.  *See* Dkt. No. 55 at 2.

The Court agrees with Defendants that the conclusory assertions contained in Plaintiff's complaint are insufficient to support a First Amendment retaliation claim against Defendant Fatata.  The only allegations pertaining to Defendant Fatata suggest that she was informed that Plaintiff was leasing the property at 315 Nichols Street in September of 2008.  *See* Dkt. No. 1 at ¶ 18.  Additionally, Plaintiff contends that, in a sworn affidavit, a City of Utica employee Jennifer Randall stated that Defendant Fatata told her to keep her apprised about Plaintiff's activities and when he entered City Hall.  *See id.* at ¶ 19.  Plaintiff further contends that Ms. Randall claimed that Defendant Fatata stated that she would not allow Plaintiff to operate at 315 Nichols Street and that she began retaliating against Plaintiff on September 7, 2008 by placing his building on the police "hot spot."  *See* Dkt. No. 1 at ¶¶ 20-21.  Despite claiming that Plaintiff has a sworn affidavit from Ms. Randall regarding Defendant Fatata's statements and actions, Plaintiff has failed to produce the document.

Accordingly, the Court grants this portion of Defendants' motion for summary judgment.


### 3.  The November 9, 2008 Incident

Defendants contend that all claims against Defendants Mucitelli and Fernald must be dismissed because said Defendants "did not commit any Constitutional Violations against Plaintiff on or about November 9, 2008."  *See* Dkt. No. 52-32 at 10.  Plaintiff does not refute this argument.  *See* Dkt. No. 55 at 2.

It is well-settled in the Second Circuit that "allegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged."  *Johnson v. Eggersdorf*, 8 Fed. Appx. 140, 143 (2d Cir. 2001) (citations omitted); *see also Milo v. City of New York*, No. 14-CV-

1172, 2014 U.S. Dist. LEXIS 160852, *14-15 (E.D.N.Y. Nov. 14, 2014) ("Verbal harassment or profanity alone, 'unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem,' does not constitute the violation of any federally protected right and therefore is not actionable under section 1983") (citations omitted).  Here, Defendant Muticelli allegedly used racial epithets and threatened to physically harm Plaintiff.  According to Plaintiff's own testimony, however, neither Defendant Muticelli nor Defendant Fernald physically assaulted Plaintiff.  *See* Dkt. No. 52-31 at ¶ 6.  As such, the Court grants Defendants' motion for summary judgment as to Plaintiff's section 1983 claim surrounding the events of November 9, 2008.

As to Plaintiff's malicious prosecution claim, the Court agrees with Defendants that Plaintiff has failed to satisfy the four-prong test discussed in *Swartz*.  "[U]nder the common law any final termination of a criminal proceeding in favor of the accused, such that the proceeding cannot be brought again, qualifies as a favorable termination for purposes of a malicious prosecution action."  *Poventud v. City of New York*, 750 F.3d 121, 130-31 (2d Cir. 2013) (quotation omitted).  "A termination is not favorable to the accused, [however], if the charge is withdrawn or the prosecution abandoned pursuant to a compromise with the accused."  *Id.* at 131 (quotation omitted).  "It is not surprising, therefore, that . . . § 1983 claims for malicious prosecution do not accrue until their respective criminal prosecutions end in acquittal."  *Id.*

In the present case, Defendants are correct that "Plaintiff has not established that the proceeding was terminated in favor of him because [he] was charged for operating a cabaret without [a] license . . . [and] was found guilty after trial."  *See* Dkt. No. 52-32 at 12.

Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's malicious prosecution claim stemming from the events of November 9, 2008.

### *4. The October 24, 2009 Incident*

Viewing Plaintiff's submissions liberally, Plaintiff is asserting the following claims regarding the October 24, 2009 arrest and subsequent prosecution: (1) unlawful search; (2) false arrest; (3) malicious prosecution; and (4) defamation. *See* Dkt. No. 1 at ¶¶ 33-56.

As to Plaintiff's false arrest claim, the Court finds that Defendants are entitled to summary judgment because Plaintiff was convicted after trial of violating § 2-14-290 of the Utica City Code of Ordinances and sentenced to fifteen days in jail. *See* Dkt. No. 52-6 at 2.[4] Plaintiff did not appeal his conviction and it is therefore valid. *See* Dkt. No. 52-3 at 146. "A conviction that survives appeal is conclusive evidence of probable cause and is therefore a complete defense to a false arrest claim brought under § 1983." *Gibson v. City of New York*, 182 F.3d 899, 899 (2d Cir. 1999) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)) (other citation omitted); *see also Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). Since probable cause is only required as to a single offense and not every offense charged on a false arrest claim, Plaintiff's false arrest claim must fail. *See Marcavage v. City of New York*, 689 F.3d 98, 109-10 (2d Cir. 2012) (citation omitted).

As to Plaintiff's malicious prosecution claim, the undisputed facts establish that Defendants had probable cause supporting the charged crimes. Upon arriving at Pete's on October 24, 2009, Defendant Duval testified that he heard loud music coming from the premises. *See* Dkt. No. 52-8 at 10-11. Defendant Duval witnessed a large crowd of juveniles exiting the premises. *See id.* at 11-12. Upon entering Pete's, Defendants observed a bar area and empty

---

[4] Although the Certificate of Disposition cites to § 2-14-290 of the Utica City Code, the Court presumes that the City Court of Utica meant to cite § 2-14-296. This provision reads: "No person shall conduct, manage or operate a cabaret/nightclub without a license or special exemption permit issued by the Chief of Police, except as provided in Section 2-14-291 herein."

liquor bottles scattered throughout the establishment. *See id.* at 19-20. Defendants also gave a

Breathalyzer test to J.B., a sixteen year-old individual at Pete's. *See* Dkt. No. 52-31 at ¶ 31; *see*

*also* Dkt. No. 52-8 at 12-13. The test indicated that J.B. had a blood alcohol content in excess of

0.08%. *See* Dkt. No. 52-31 at ¶ 31. Further, T.S. testified that she physically paid Plaintiff $200

to rent out Pete's for her birthday, a fact which Plaintiff does not contest. Further, Maurice Titus

testified that he was hired to DJ the party and that he observed many under-aged individuals

consuming alcohol at the party. *See* Dkt. No. 52-11 at 2-4.[5] In a conclusory fashion, Plaintiff

contends that Defendants fabricated the crime scene by placing old beer and liquor bottles

throughout the premises. This contention, however, lacks any evidentiary support and is directly

contradicted by the testimony of the non-party witnesses who were present at the party. It is

evident, as discussed in greater detail above, Defendants' observations, supported by the

testimony of witnesses at the party, provided probable cause for the charges brought against

Plaintiff on October 24, 2009.

Alternatively, the Court finds that Defendants are entitled to qualified immunity as to

Plaintiff's malicious prosecution claim relating to the events of October 24, 2009. Qualified

immunity in the context of malicious prosecution and false arrest gives rise to the concept of

"arguable probable cause." "'An officer's determination is objectively reasonable if there was

"arguable" probable cause at the time of arrest – that is, if officers of reasonable competence

---

[5] "It shall be unlawful for any person, partnership or corporation operating a place for profit or pecuniary gain, with a capacity for the assemblage of twenty or more persons to permit a person or persons to come to the place of assembly for the purpose of consuming alcoholic beverages on said premises, which alcoholic beverages are either provided by the operator of the place of assembly, his agents, servants or employees, or are brought onto said premises by the person or persons assembling at such place, unless an appropriate license has first been obtained from the state liquor authority by the operator of said place of assembly." N.Y. Alcoholic Beverage Control Law § 64-b.

could disagree on whether the probable cause test was met.'" *Gonzalez v. City of Schenectady*, 728 F.3d 149, 157 (2d Cir. 2013) (quotations omitted); *Betts v. Shearman*, 751 F.3d 78, 83 (2d Cir. 2014) (citation omitted).  Defendants' observations, in addition to Mr. Titus' testimony, sufficiently provided Defendants with arguable probable cause for the charges brought against Plaintiff and subsequent prosecution; and therefore, Defendants are entitled to qualified immunity as to this claim.

Based on the record before the Court, it does not appear that Plaintiff challenged the legality of the search and seizure in the state criminal proceeding.  Plaintiff's failure to challenge the search and seizure in his state criminal trial precludes him from litigating the issue in this forum.  *See Hayes v. County of Sullivan*, 853 F. Supp. 2d 400, 429 (S.D.N.Y. 2012) (holding that *res judicata* precluded the plaintiff's Fourth Amendment claims because he failed to challenge the legality of the search and seizure in the underlying criminal action) (citations omitted).  Even had Plaintiff unsuccessfully challenged the legality of the search and seizure in the criminal action, his claims would still be precluded by the doctrine of collateral estoppel.  *See Phelan v. Sullivan*, 541 Fed. Appx. 21, 24 (2d Cir. 2013) (explaining that because "[the plaintiff] had a full and fair opportunity to litigate his search and seizure claim" during his state criminal trial "[the plaintiff] is collaterally estopped from raising these claims in federal court").  Moreover, a finding that the search of Pete's was unconstitutional would necessarily require the Court to call into question, directly or indirectly, the validity of the search that led to his eventual conviction for Operating a Cabaret Without a License.  *See Johnson v. Watkins*, 101 F.3d 792, 794 (2d Cir. 1996) ("Under 28 U.S.C. § 1738, a federal court must*,* in according full faith and credit, give to a State court judgment the same preclusive effect as would be given to the judgment under the law of the State in which the judgment was rendered.  This rule applies with equal force to actions brought under

42 U.S.C. § 1983") (internal citation and other citations omitted). Further, the record is clear that Defendants had probable cause to believe that criminal activity was taking place inside the premises, based upon their observations before entering the building, including intoxicated minors and the likely violation of the City's cabaret ordinance. *See Fortson v. City of Elberton*, ___ Fed. Appx. ___, 2014 WL 6601055, *3-*4 (11th Cir. Nov. 21, 2014) (holding that the defendants were permitted to enter the plaintiff's business, which had been rented out for a party, since they were responding to a noise complaint and, once inside, the plain view doctrine permitted them to document any readily observable criminal activity) (citations omitted).

Alternatively, the Court finds that Defendants are entitled to qualified immunity because it was objectively reasonable for the officers to believe that their conduct was lawful, especially in light of the past incidents at Pete's and the presence of a large number of underage individuals entering and exiting the establishment. *See Gonzalez*, 728 F.3d at 154 (citation omitted); *see also Fortson*, 2014 WL 6601055, at *3-*4 (finding that, in a factual similar case, that it was not clearly established that the defendants' actions would have violated the plaintiff's rights).

Lastly, the Court finds that Plaintiff's defamation claim is barred by the applicable statute of limitations. Under New York law, a defamation claim must be asserted within one year of the date on which the defamatory statement was published or uttered to a third party, even if it would have been impossible for the plaintiff to discover the injury at that time. *See N.Y. C.P.L.R. §* 215(3) (McKinney 2014). Where a plaintiff sues "a city, county, town, village, fire district or school district," however, a one-year-and-ninety-day statute of limitations governs. Gen. Mun. Law § 50-i. The Second Circuit has recognized that General Municipal Law § 50-i "takes precedence over the one-year period of limitations provided for in CPLR 215." *See Conte v. Dillon*, No. 13-3054-cv, 2014 WL 7156665, *3 (2d Cir. Dec. 17, 2014); *see also Allyn v.*

*Rockland Cnty.*, No. 12 CV 5022, 2013 WL 4038602, *6 (S.D.N.Y. July 30, 2013); *Morse v. Fitzgerald*, No. 10-CV-6306, 2013 WL 1195036, *11 (W.D.N.Y. Mar. 20, 2013). The New York courts have also held that the one-year-and-ninety-day statute of limitations applies to claims not only against municipalities themselves, but also against "any officer, agent, or employee thereof," if the municipality is required to indemnify the defendant pursuant to the General Municipal Law or any other statutory provision and is therefore "the real party in interest." *Coe v. Town of Conklin*, 94 A.D.3d 1197, 1199 (3d Dep't 2012) (internal citation omitted).

Here, Plaintiff's complaint alleges that the defamatory statements occurred on October 24, 2009. *See* Dkt. No. 1 at ¶¶ 52-53. Plaintiff did not commence this action, however, until October 23, 2012. *See* Dkt. No. 1. Since that is more than one year and ninety days after the alleged defamation, Plaintiff's claim is untimely.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's aforementioned claims stemming from the events of October 24, 2009.

### 5.  *Defendants' Search of Pete's on January 1, 2010*

In his complaint, Plaintiff contends that Defendants illegally entered and searched Pete's on January 1, 2010. *See* Dkt. No. 1 at ¶¶ 58-60. Plaintiff, however, has retracted this claim and will no longer refute the legality of the January 1, 2010 search of Pete's on the basis that he was not the owner of the establishment. *See* Dkt. No. 55 at 11.

Accordingly, the Court grants Defendants' motion for summary judgment regarding the entry and search of Pete's on January 1, 2010.[6]

---

[6] Alternatively, even if Plaintiff maintained his argument that the January 1, 2010 search of Pete's was unlawful, the Court finds that Defendants acted in objective good faith in procuring

(continued...)

### *6. Plaintiff's Arrest on January 1, 2010 and Subsequent Prosecution*

Plaintiff contends that Defendants falsely arrested him on January 1, 2010.  *See* Dkt. No. 1 at ¶¶ 61-63.  Additionally, Plaintiff contends that he was subject to malicious prosecution for the charges that stemmed from the January 1, 2010 search of Pete's.  *See id.*

After the search of Pete's on January 1, 2010, Plaintiff was charged with operating a cabaret without a license and operating an unlicensed "bottle club."  *See* Dkt. No. 52-22 at 2-3.  Defendants concede, however, that Plaintiff was acquitted of both charges after trial.  *See* Dkt. No. 52-32 at 35.  Rightfully, both the false arrest and malicious prosecution claims will turn on a determination of whether there was probable cause and/or arguable probable cause.

When Defendants arrived at Pete's on January 1, 2010, loud music could be heard.  When Defendants entered Pete's, pursuant to a search warrant, full and empty alcohol containers were scattered throughout the establishment, a bartender was present at the bar, and a DJ was playing music (as advertised in the flyer).  Furthermore, all of this was captured on video.  Although Plaintiff is correct that the video does not actually depict anyone *consuming* alcohol, it is immaterial to the finding of probable cause.  Defendants' testimony, along with the video surveillance, provide sufficient evidence that Defendants had probable cause to arrest and prosecute Plaintiff for violating N.Y. Alcoholic Bev. Control Law § 64-b and Utica City Code § 2-14-296.

Here, Plaintiff testified that he prepared food for the event at Pete's on January 1, 2010.

---

[6](...continued)

and acting on the search warrant.  *See Messerchmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012) ("Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith'") (citation omitted).

*See* Dkt. No.52-3 at 66-68.  Additionally, Plaintiff testified to having invited one of his brothers

to Pete's that evening and that his brother did attend the gathering.  *See id.* at 69-70, 72-73.

Plaintiff also testified to having stood by the front door the entire night, allowing people to enter

and exit the establishment.  *See id.* at 77-78.  Furthermore, video surveillance taken inside Pete's

plainly depicts "musical entertainment, singing, [and] dancing" and Plaintiff admits that there was

music and a DJ, as required to find that Plaintiff had been operating an illegal cabaret.  *See* Utica

City Code §§ 2-14-290, 2-14-296.  The video surveillance also plainly depicts more than twenty

individuals, that alcohol had been consumed, and that containers of alcohol were scattered

throughout the premises, including behind bar, as required to find Plaintiff had been operating an

unlicensed bottle club.  The video evidence is only strengthened by Plaintiff's own testimony that

there were "[a]bout 30, 35, about 35 people" at Pete's that evening.  *See* Dkt No. 52-3 at 81.

     Lastly, the Court finds that, in the alternative, Defendants are entitled to qualified

immunity as to these claims because they had arguable probable cause to arrest and prosecute

Plaintiff for the crimes alleged.

     Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's

false arrest and malicious prosecution claims stemming from the events on January 1, 2010.


### 7.  *Due Process Claim Concerning the Administrative Hearing and Determination*

     In his complaint, Plaintiff alleges that his procedural due process rights were violated as a

result of the nuisance abatement proceeding.  *See* Dkt. No. 1 at ¶¶ 64-69.  Plaintiff contends that

on May 13, 2010, Defendant LaBella determined that there were six violations committed by

Plaintiff at the 315 Nichols Street property.  *See* Dkt. No. 55 at 15.  Plaintiff further contends that

"[t]he premise was then closed down for a year *denying the plaintiff the right to earn a living*."

*Id.* (emphasis added).[7]  Plaintiff argues that this determination was based solely on the testimony of Defendant Noonan, whom Plaintiff contends lied during the proceeding regarding the charges that had been brought against him.  *Id.*; *see also* Dkt. No. 1 at ¶ 66.

Defendants are entitled to summary judgment on this claim for several reasons.  First, Plaintiff did not file an Article 78 proceeding to challenge the administrative hearing determination, which is fatal to his procedural due process claim.  *See Beachwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 156-57 (2d Cir. 2006); *see also Hafez v. City of Schenectady*, 894 F. Supp. 2d 207, 215 n.9 (N.D.N.Y. 2012) (citations omitted).  Similarly, Plaintiff failed to appeal Judge Hester's injunction order.  *See* Dkt. No. 52-3 at 57-58.  Ultimately, Plaintiff was afforded due process because he was given due notice of the proceeding and failed to appear.  *See* Dkt. No. 52-27 at 26-28, 50.

Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's due process claim.

### 8.  *Video Surveillance of Pete's from March 21, 2009 through April 12, 2009*

In his complaint, Plaintiff alleges that Defendant Grande "placed plaintiff and plaintiff's building located at 315 Nichols Street under video surveillance without a warrant from March 21, 2009 through April 12, 2009 intruding on plaintiff['s] right to privacy."  Dkt. No. 1 at ¶ 70. Additionally, Plaintiff contends that Defendant Grande reviewed these surveillance videos and charged him with twelve City of Utica violations, which were dismissed by the corporation

---

[7] Throughout this litigation and Plaintiff's dealing with Defendants, Plaintiff has continuously denied that he was operating a business at 315 Nichols Street after November 10, 2008.  *See* Dkt. No. 1 at ¶ 30.  It is unclear how Plaintiff could have been earning a living through 315 Nichols Street if he was not operating a business out of the location.

counsel's office on March 17, 2011.  *See id.* at ¶ 71.

Defendants argue that they are entitled to summary judgment on this claim because it is barred by the applicable statute of limitations.  *See* Dkt. No. 52-32 at 40.  Plaintiff has not responded to this part of Defendants' motion.

Defendants are correct that Plaintiff's illegal surveillance claim is untimely.  The video surveillance occurred up and until April 12, 2009 and Plaintiff did not file this action until October 23, 2012.  *See* Dkt. No. 1.  Since this claim is subject to a three year statute of limitations, it is untimely.[8]

Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's unlawful surveillance claim.


### 9.  Defamation Claim Concerning March 24, 2010 and November 18, 2010

Defendants argue that they are entitled to summary judgment on this claim because it is also barred by the applicable statute of limitations.  *See* Dkt. No. 52-32 at 40-41.  Plaintiff has not responded to this part of Defendants' motion.

In his complaint, Plaintiff contends that "defendants defamed plaintiff on several occasions through interviews with local media."  Dkt. No. 1 at ¶ 72.  Plaintiff specifically references two instances of alleged defamation.  First, on March 24, 2010, Plaintiff contends that Defendant Hauck falsely accused Plaintiff of conducting unlawful activity by stating that "[t]his shows that you can't continue to run illegal operations and not see some kind of consequences."

---

[8] According to the Supreme Court, an action brought pursuant to 42 U.S.C. § 1983 shall be governed by the state statute of limitation for personal injury actions.  *See Owens v. Okure*, 488 U.S. 235, 249-51 (1989).  "Section 1983 actions filed in New York are therefore subject to a three-year statute of limitations."  *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) (citation omitted); *see also* N.Y. C.P.L.R. § 214(5) (McKinney 2014).

*Id.* at ¶ 74.  Additionally, on November 18, 2010, Plaintiff contends that Defendant Williams falsely accused Plaintiff of promoting unlawful activity because "[h]e brought a lot of crime to the neighborhood and the police calls show it."  *Id.* at ¶ 75.

The Court agrees with Defendants that Plaintiff's defamation claim is untimely.  Plaintiff effectively concedes that Defendants' alleged defamatory statements were made well before July 25, 2011 — one year and ninety days prior to October 23, 2012, when Plaintiff filed his complaint.  *See* Dkt. No. 1.

Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's defamation claim stemming from the events of March 24, 2010 and November 18, 2010.


### *10.  Plaintiff's Conspiracy Claim*

To maintain a conspiracy claim under either section 1983 or section 1985, the plaintiff must establish that the defendants violated one of his constitutional rights.  *See Friends of Falun Gong v. Pac. Cultural Enter., Inc.*, 288 F. Supp. 2d 273, 279 (E.D.N.Y. 2003) (citations omitted); *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) (citation omitted).  Additionally, the intra-corporate conspiracy doctrine, which applies to conspiracy claims pursuant to both 42 U.S.C. § 1983, *see Dilworth v. Goldberg*, No. 10 Civ. 2224, 2012 WL 4017789, *30 (S.D.N.Y. Sept. 13, 2012); *Anemone v. Metro. Transp. Auth.*, 419 F. Supp. 2d 602, 603-04 (S.D.N.Y. 2006), and 42 U.S.C. § 1985, *see Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978), holds that "officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other."  *Pflaum v. Town of Stuyvesant*, 937 F. Supp. 2d 289, 305 n.6 (N.D.N.Y. 2013).  The intra-corporate conspiracy doctrine "extends to public corporate bodies, including municipalities."  *Nimkoff v.*

*Dollhausen*, 751 F. Supp. 2d 455, 466 (E.D.N.Y. 2011) (citation omitted); *see also Michael v. Cnty. of Nassau*, No. 09-cv-5200, 2010 WL 3237143, *5 (E.D.N.Y. Aug. 11, 2010) (holding that the intra-corporate conspiracy doctrine applies to municipalities).

Since Plaintiff failed to establish that Defendants violated any of his constitutional rights, the Court grants Defendants' motion for summary judgment as to Plaintiff's conspiracy claims. Moreover, the intra-corporate conspiracy doctrine precludes Plaintiff's conspiracy claims because the alleged conspirators were employed by the same municipal entity—the City of Utica. *See Baines v. Masiello*, 288 F. Supp. 2d 376, 394-95 (W.D.N.Y. 2003) (holding that a conspiracy claim brought against "the Common Council, the Mayor, and the City Clerk" was barred by the intra-corporate conspiracy doctrine); *Broich v. Inc. Vill. of Southampton*, 650 F. Supp. 2d 234, 247 (E.D.N.Y. 2009) (holding that conspiracy claim against the Village Board trustees, mayor, and former and current chief of police are barred by the intra-corporate conspiracy doctrine) (citations omitted).

Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's conspiracy claims.

## IV. CONCLUSION

After careful review of the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 52) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 9, 2015
       Albany, New York

Mae A. D'Agostino
U.S. District Judge